**FIRST DIVISION
BARNES, P. J.,
BROWN and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**January 9, 2023**

# In the Court of Appeals of Georgia

A22A1708. USSERY v. THE STATE.

BROWN, Judge.

Columbus Ussery appeals from his conviction of driving under the influence of alcohol in violation of OCGA § 40-6-391 (a) (5) (per se).[1] He contends that the trial court erred by admitting the results of a blood test because the State failed to show that the person who drew his blood was qualified to do so under OCGA § 40-6-392 (e) (1), and that insufficient evidence supports his conviction in the absence of the blood test results. We disagree and affirm.

The State "has the burden of demonstrating compliance with the statutory, foundational requirements" found in OCGA § 40-6-392. *Peek v. State*, 272 Ga. 169

---

[1] The jury found Ussery not guilty of driving under the influence in violation of OCGA § 40-6-391 (a) (1) (less safe) and failure to maintain lane.

(527 SE2d 552) (2000). It "also has the burden of proving the qualifications of any person who draws blood at the request of a law enforcement officer." Id. The Supreme Court of Georgia has stated that "[t]hese requirements are consistent with the statutory mandate of the General Assembly that the use of such tests in criminal trials shall be subject to the strictest protections. . . . *Munda v. State*, [172 Ga. App. 857,] 858 [(324 SE2d 799 (1984)] (quoting *State v. Johnston*, 160 Ga. App. 71, 73 (286 SE2d 47) (1981), aff'd, 249 Ga. 413 (291 SE2d 543) (1982))." (Punctuation omitted.) *Peek*, 272 Ga. at 170.[2] It is "the duty of the trial court to determine the adequacy of the foundation" for the admission of evidence. *Wigfall v. State*, 257 Ga. 585, 586 (2) (361 SE2d 376) (1987). In the absence of an abuse of discretion, we will not reverse a trial court's finding that a proper foundation has been laid. *Weakley v. State*, 259 Ga. 205, 206 (3) (378 SE2d 688) (1989); *Douglas v. State,* 228 Ga. App. 368, 370 (3) (491 SE2d 821) (1997). Having examined the State's burden of proof and our standard of review, we now turn to the relevant statutory provisions.

OCGA § 40-6-392 (a) (1) (B) (2) provides:

---

[2] This quote, standing alone, makes it appear that there is an express statutory mandate in OCGA § 40-6-392 that the use of chemical tests be subjected to the "strictest protections." While no such express provision exists, this Code section undoubtedly imposes numerous requirements for the admission of chemical tests, and we will faithfully follow the Supreme Court of Georgia's guidance in *Peek*.

When a person shall undergo a chemical test at the request of a law enforcement officer, only a physician, registered nurse, laboratory technician, emergency medical technician, or other qualified person may withdraw blood for the purpose of determining the alcoholic content therein, provided that this limitation shall not apply to the taking of breath or urine specimens.

OCGA § 40-6-392 (e) provides:

> (1) A certification by the office of the Secretary of State or by the Department of Public Health that a person who drew blood was a licensed or certified physician, physician assistant, registered nurse, practical nurse, medical technologist, medical laboratory technician, or phlebotomist at the time the blood was drawn;
>
> (2) Testimony, under oath, of the blood drawer; or
>
> (3) Testimony, under oath, of the blood drawer's supervisor or medical records custodian that the blood drawer was properly trained and authorized to draw blood as an employee of the medical facility or employer

shall be admissible into evidence for the purpose of establishing that such person was qualified to draw blood as required by this Code section.

In *Peek*, the Supreme Court of Georgia explained:

3

Because the established methods of memorializing the accuracy of breath-testing devices and radar devices and the qualification of persons who draw blood impinge to some degree on the constitutional right of confrontation, the courts must resist the temptation to expand the class of acceptable methods. The legislature has provided a safeguard in the form of a specific certification by the State of the qualifications of the person who drew blood. The establishment of those qualifications by the testimony of the person who drew blood also provides a traditional safeguard, the opportunity to test the truth of the testimony by cross-examination. Given the potential impact of these matters on the right to confrontation, we conclude that the only acceptable methods of proving the qualification of the person who drew a defendant's blood are the certificate provided for in OCGA § 40-6-392 (e), introduced by means of the business records exception to the hearsay rule, and the testimony of the person who drew the blood.

(Citation omitted.) 272 Ga. at 171. At the time of the *Peek* decision, the only method contained in OCGA § 40-6-392 (e) was the certification now embodied in OCGA § 40-6-392 (e) (1). Following the *Peek* decision, the General Assembly amended the statute to codify the Supreme Court of Georgia's holding that testimony by the person who drew the blood would also suffice and added a third method — testimony by the blood drawer's supervisor or medical records custodian. Ga. L. 2001, p. 208, § 1-6.

4

In this case, the State did not present testimony from the person who drew the blood or a certification from the Secretary of State or the Department of Public Health. Instead, it presented testimony from the owner of Ten-Eight Forensic Service, the company hired to draw Ussery's blood on July 6, 2018, at the Gwinnett County jail. The owner testified that beginning in 2007, she began providing blood-draw services to police agencies, and at the time of trial, she provided services to 18 counties and 32 law enforcement agencies. She hires a contract team staff for every county and "normally" contracts with "EMTs, paramedics, RNs, LPNs, nurses, doctors, whoever's in the medical field." The people she hired had "full-time jobs in hospitals and doctors' offices" and worked for her part-time to supplement their income. In order to be hired by her company to draw blood, a person would need to have "[s]chool qualifications and a good background check." By school qualifications, she meant "graduating from whatever school or university they went through to get their nursing degree or their phlebotomy certificate or whatever they're obtaining." When she hires someone, she checks their credentials, does a thorough background check, and then the person goes out with a seasoned technician to watch how it is done. After completing training with a seasoned technician, each person

5

hired goes out with the owner, a licensed practical nurse, who provides supervision and critique before they are released to do blood draws on their own.

The owner testified that the person who drew Ussery's blood was "[o]ne of [her] best" and that she never received any complaints about her. At the time the blood drawer first started working for the owner, she was also working for Quest Diagnostic until she later resigned and "started her Social Security." She continued working for the owner for a total of three to four years; she left less than a year before Ussery's trial in April 2022, due to a death in her family and a relocation. The owner testified that "[s]he was the best person [she] had" and had "been praying and begging her to come back." At the time she drew Ussery's blood in July 2018, she would have been fairly new, but the owner was not certain.

Finally, the owner testified that she would receive a renewal of the blood drawer's phlebotomy technician certificate each year, and the State introduced a document obtained from the owner showing that the person who drew Ussery's blood renewed her membership with the "American Society of Phlebotomy Technicians, Inc." on February 22, 2019. The document lists the title of the blood drawer as a "Certified Phlebotomy Technician," her member number, and an expiration date of February 22, 2020 for her membership. It also states, "Your next renewal year begins

6

in December, 2019. Between December 1st, 2019 and January 30th, 2020, . . . renewal fees for 2020 should be completed and submitted."

Having examined all of the evidence before the trial court, we cannot conclude that it abused its discretion by finding that the State met its burden of showing through the testimony "of the blood drawer's supervisor or medical records custodian that the blood drawer was properly trained and authorized to draw blood as an employee of the medical facility or employer" under OCGA § 40-6-392 (e) (3). This conclusion renders Ussery's remaining enumeration of error moot.

*Judgment affirmed. Barnes, P. J., and Hodges, J., concur.*